**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

VALIDATA CHEMICAL SERVICES,

*Plaintiff*,

v.

UNITED STATES DEPARTMENT OF
ENERGY, et al.,

*Defendants*.

Civil Action No. 13-1882 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

In 2011, Defendant Department of Energy ("DOE") awarded a contract for environmental remediation services to URS | CH2M Oak Ridge, LLC ("UCOR"). In 2012, Plaintiff Validata Chemical Services ("Validata") bid on, but did not win, a small business set-aside subcontract for data validation services to support UCOR's remediation work. Validata then sought to contest the award of the subcontract to its competitor, Portage, Inc., arguing that Portage did not meet the applicable size standard for the small business set-aside subcontract. Validata objected on numerous grounds. It argued that DOE had improperly approved the subcontract award, despite its knowledge that Portage did not meet the applicable requirements, and had improperly made its own size determination, rather than leaving that question to the Small Business Administration ("SBA"). Validata also complained that the subcontract solicitation did not contain a North American Industry Classification System ("NAICS") code; that the code that UCOR actually used was incorrect; and that had UCOR used the correct code, Portage would not have qualified. After unsuccessfully raising these issues in whole or in part with UCOR and the SBA's Office of Hearings and Appeals ("SBA-OHA"), Validata brought

this suit against DOE and the SBA, asserting claims under the Administrative Procedure Act[1]

("APA") and the Fifth Amendment Due Process Clause.  Dkt. 6 at 12–14 (Amend. Compl.

¶¶ 31–39).

Before considering the merits of Validata's claims, the Court must consider whether it

has jurisdiction to do so.  The answer to that question turns on the meaning of the Administrative

Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, 110 Stat. 3870, which is

codified at 28 U.S.C. § 1491(b).  Although at one time ADRA provided concurrent jurisdiction

over certain procurement-related disputes in the federal district courts and the U.S. Court of

Federal Claims, its grant of jurisdiction to the federal district courts expired in 2001.

Accordingly, as the law now stands, the Court of Federal Claims has *exclusive* jurisdiction over:

> an action by an interested party objecting to a solicitation by a Federal agency for
> bids or proposals for a proposed contract or to a proposed award or the award of a
> contract or any alleged violation of statute or regulation in connection with a
> procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).

Validata contends that because a subcontractor is not an "interested party" as that term

has been construed by the Federal Circuit and the Court of Federal Claims, § 1491(b)(1) does not

oust this Court of jurisdiction to adjudicate its claims.  Dkt. 26-1.  The government initially

disagreed, arguing that the Court of Federal Claims had exclusive jurisdiction over this matter.

On further reflection, however, it has come to the view that Validata is right and that

§ 1491(b)(1) does not apply.  As explained below, notwithstanding the parties' agreement on the

matter, the Court concludes that it lacks jurisdiction over Validata's claims.  In the interest of

---

[1]  Although not all of Validata's claims that DOE and the SBA failed to comply with the
governing statutes and regulations are denominated as APA claims, Validata does not assert any
private right of action with respect to those claims other than that supplied by the APA.  *See
generally* Dkt. 6 (Amend. Compl.).

justice, the Court will therefore transfer the case to the Court of Federal Claims, where the action could have been brought at the time it was filed.  *See* 28 U.S.C. § 1631.

# I.  BACKGROUND

The following facts, derived from the amended complaint and declarations submitted by the parties, are taken as true solely for purposes of determining whether the Court has jurisdiction over this matter.  *See, e.g.*, *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) ("We assume the truth of all material factual allegations . . . and upon such facts determine jurisdictional questions."); *see also* Fed. R. Civ. P. 12(b)(1).

## A.      The Subcontract Procurement

On April 28, 2011, DOE awarded UCOR a contract to provide environmental remediation services at the East Tennessee Technology Park in Oak Ridge, Tennessee, until July 2020.  Dkt. 6 at 8 (Amend. Compl. ¶ 14); Dkt. 22-1 at 4 (Cloar Decl. ¶ 4).  In 2012, UCOR conducted a solicitation for a subcontractor to provide analytical data validation services in support of this prime contract.  Dkt. 6 at 2 (Amend. Compl. ¶¶ 1–2); Dkt. 12-2 at 94.  Although there is no dispute that the subcontract was set aside for a prequalified small business, Dkt. 12-2 at 1, the parties do not address whether the set-aside was made pursuant to provisions of the prime contract, federal law, or both.  The prime contract does not appear in the present record, but 15 U.S.C. § 637(d) requires that "all contracts let by any Federal agency," with certain exceptions not relevant here, include a clause stating that "[i]t is the policy of the United States that small business concerns . . . have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency, including . . . subcontracts," and that "[t]he contractor hereby agrees to carry out this policy in the awarding of subcontracts."

According to a declaration submitted by Heather Cloar, the DOE contracting officer for the prime contract, she authorized "UCOR to enter into competitive firm-fixed-price subcontracts with dollar values of up to $5,000,000 and cost-type subcontracts with dollar values of up to $2,000,000 without seeking" further consent.  Dkt. 22-1 at 1–2 (Cloar Decl. ¶¶ 1–2).  As she further explains, as a result, UCOR "was not required to submit its prequalification criteria, its solicitation, or its award documentation to DOE for consent and it did not submit [them] to [her] or anyone in DOE."  *Id*. at 2 (Cloar Decl. ¶ 3).  UCOR's "purchasing system," including its system for subcontracting, was, however, subject to periodic review and approval.  *Id*. at 1–2 (Cloar Decl. ¶ 1).

Validata competed for, but did not win, the subcontract.  Dkt. 6 at 2 (Amend. Compl. ¶ 1).  On September 18, 2012, UCOR notified Validata that Portage had won it.  *Id.* at 9 (Amend. Compl. ¶ 18).  Validata then attempted to challenge the award to Portage.  First, Validata expressed concern to UCOR Subcontract Administrator Cindy Hart that Portage was not a small business.  Dkt. 12-2 at 101–105.  Hart replied that UCOR no longer accepted or allowed size protests, but that she would check whether anything could be done.  *Id.* at 105.  On October 2, Hart informed Validata that, based on offeror-submitted information "gathered through the [Central Contractor Registration (System for Award Management)] CCR(SAM)" and after consulting with UCOR Small Business Program Manager Karen Reeve, UCOR believed that Portage was a small business with fewer than 500 employees.  *Id.* at 11.  Hart stated that Validata could nevertheless submit a formal size protest to her.  *Id.*  On the present record, it is unclear whether Hart and Reeve were acting as the agents of UCOR, DOE, or both.  The two used "doe.gov" e-mail addresses, *see id.* at 101, 107, but their titles—UCOR Subcontract Administrator and UCOR Small Business Program Manager—suggest that they worked for

UCOR, *id.* at 11.  One letter to Validata appears to refer to Reeve as the "DOE-ORO Small

Business Program Manager."  *Id.* at 118.

Validata submitted a formal size protest to Hart on October 9, 2012.  Dkt. 15-1 at 2–5.

On October 11, Reeve informed Validata that it must "put [its] formal complaint in writing to the

SBA in Boise, I[daho]."  Dkt. 12-2 at 107.  On October 29, Validata informed Reeve and Hart

that it had conferred with various personnel at SBA and learned that the San Francisco SBA

office handled size protests for the region; that UCOR or DOE, rather than Validata, should refer

the size protest to SBA; and that someone from SBA's San Francisco office would contact them

about it.  *Id.* at 113.  Reeve replied, "Sorry we have given the correct information.  It is not up to

UCOR to do anything else."  *Id.*  On October 30, however, Reeve provided Validata with a list of

"what original documents need[ed] to be turned into" her for the size protest and stated that she

would in turn submit them to the San Francisco SBA office and to UCOR Corporate.  *Id.* at 115–

16.

On November 6, 2012, Validata sent UCOR a letter, which does not appear in the record,

complaining that UCOR had given it erroneous information about the process for filing a size

protest and that, as a result, it could no longer file a timely protest under the federal regulations.

Dkt. 6 at 10 (Amend. Compl. ¶ 24).  At the same time, it expressed concern about whether

NAICS code 562910 was appropriate for the subcontract procurement.  Dkt. 12-2 at 3.  NAICS

codes "define establishments based on the activities in which they are primarily engaged."  U.S.

Small Bus. Admin., *Determine Your NAICS Code*, http://tinyurl.com/SBANAICS (last visited

Mar. 9, 2016).  SBA promulgates "small business size standards on an industry-by-industry

basis" and publishes the "size standards matched to industry NAICS codes."  Federal Acquisition

Regulation ("FAR") 19.102(a)(1).  As of 2012, NAICS code 562910 for "Environmental Remediation Services" had a size standard of 500 employees.  13 C.F.R. § 121.201 (2012).[2]

On December 3, 2012, UCOR sent Validata a letter stating that it had "re-examined the issues," including conferring with the "DOE-ORO Contracting Officer" and the "DOE-ORO Small Business Program Manager," and that it reaffirmed its conclusions that NAICS code 562910 was correctly applied, that Portage met the 500-employee size standard for that code, and that "the subcontract was awarded under fair and adequate competition and [UCOR] considers this issue closed."  Dkt. 12-2 at 118.

## B.     SBA-OHA Appeal

After conferring with an SBA procurement analyst based in Washington, D.C., about the appropriate NAICS code for the subcontract, *id.* at 99, Validata filed a NAICS code appeal with SBA-OHA on January 3, 2013, *id.* at 53, challenging UCOR's use of NAICS code 562910 for the subcontract procurement.  Validata asserted that the solicitation should have used NAICS code 541620, which covers "Environmental Consulting Services" and, at the time, had an accompanying size standard of $14 million in annual receipts.  *Id.* at 58–63; 13 C.F.R. § 121.201 (2012).[3]  It also argued that the requirement in 13 C.F.R. § 134.304(b) that a NAICS code appeal be filed and served within 10 days of the issuance of the solicitation or an amendment to the solicitation affecting the NAICS code or size standard did not apply because the subcontract solicitation never included a NAICS code or size standard.  Dkt. 12-2 at 53–58.  Although the Request for Proposals ("RFP") for the subcontract did not contain a NAICS code or size

---

[2]  The size standard for NAICS code 562910, for "Environmental Remediation Services" has since been increased to 750 employees.  13 C.F.R. § 121.201 (2016).

[3]  The size standard for NAICS code 541620 has since been modified to set a cap of $15 million in annual receipts.  13 C.F.R. § 121.201 (2016).

standard, *id.* at 72, 95–96, that information was provided at two other junctures in the

subcontract procurement process: during the prequalification process and in "Questions and

Answers" posted on UCOR's website shortly before the proposal deadline.[4]

Validata also stated in its SBA-OHA appeal that its "size protest [was] not the subject of

th[e] submittal," but it described its failed efforts to submit a size protest to SBA through UCOR

and asked SBA-OHA to "compel UCOR to submit Validata's previously filed size protest" to the

SBA office in San Francisco for processing.  Dkt. 12-2 at 63–69.  It explained that even if that

office held the protest to be untimely, that determination would give Validata the opportunity to

appeal to SBA-OHA.  *Id.* at 69; *see also* 13 C.F.R. §§ 134.301, 134.304 (providing that a size

appeal to SBA-OHA must be filed within 15 calendar days after receipt of the formal size

determination of an SBA Government Area Contracting Office).

On February 14, 2013, SBA-OHA dismissed the appeal on two grounds:  First, it held

that the challenge to the NAICS code assigned to the subcontract was moot because SBA-OHA

had "no authority to order UCOR to reopen the competition, or to terminate the subcontract with

Portage" once it was awarded.  *Validata Chem. Servs., Inc.*, SBA No. NAICS-5449 (2013), 2013

---

[4]  A prequalification phase preceded the RFP, and a form in the prequalification packet stated
that a potential offeror must document its ability to meet "the Prequalification Criteria set forth
below" and that only small businesses were eligible. Dkt. 12-2 at 126, 128.  The set-aside
section of the form listed "NAICS Code: 562910, Environmental Remediation Services, Size
Standard: 500 employees." *Id.* at 129.  Validata completed this form and was subsequently
accepted as prequalified to make an offer for the subcontract. Dkt. 6 at 8 (Amend. Compl. ¶ 15);
Dkt. 12-2 at 13–23.

Then, five days before the proposal deadline, UCOR posted "Questions and Answers" on
its website. Dkt. 6 at 8 (Amend. Compl. ¶ 16); Dkt. 12-2 at 36–37.  One "Q & A" explained that
the project's "NAICS code is 562910.  Size standard is 500 employees." Dkt. 12-2 at 37.  Two
days later, on August 17, 2012, Validata submitted its proposal, as well as a certification that it
qualified as a small business under NAICS code 562910 and the size standard of 500 employees.
Dkt. 6 at 9 (Amend. Compl. ¶ 17); Dkt. 12-2 at 25, 34.

WL 795607, at *3.  Second, it held that the NAICS code appeal was untimely under 13 C.F.R.

§ 134.304(b) and FAR 19.303(c)(1).  *Id.* at *4.  It did not discuss Validata's failed efforts to file a

size protest.

## C.   The Present Suit

On November 27, 2013, Validata filed this action.  Dkt. 1.  The amended complaint, filed

on February 24, 2014, asserts two claims against DOE: (1) that DOE violated the APA "in its

consent or approval to UCOR's issuance of the subcontract award" despite "numerous violations

during the procurement process," such as the failure of the solicitation to contain a NAICS code

or size standard and the failure to adjudicate properly Validata's size protest, Dkt. 6 at 12–13

(Amend. Compl. ¶ 32); and (2) that it violated 15 U.S.C. § 637(b)(6) and FAR 19.301(b) and

19.302(c) by making its own size determination instead of referring the matter to SBA and that it

"act[ed] in concert with UCOR to hinder and thwart Plaintiff's right to file a size protest," Dkt. 6

at 14 (Amend. Compl. ¶¶ 38–39).  Validata also asserts two claims against the SBA-OHA: (1)

that the SBA-OHA violated the APA in dismissing Validata's NAICS code appeal as untimely

and moot, *id.* at 13 (Amend. Compl. ¶ 34); and (2) that the SBA-OHA violated the Due Process

Clause of the Fifth Amendment in dismissing the company's appeal, *id.* at 13–14 (Amend.

Compl. ¶ 36).

Defendants moved to dismiss or, alternatively, for summary judgment.  Dkt. 12.  On

November 26, 2014, the case was randomly reassigned.  Subsequently, the Court ordered the

parties to address whether the subcontract at issue had been fully performed and, if so, whether

the case was moot.  *See* Nov. 24, 2015 Minute Order.  In response, Defendants supplied a

declaration explaining that the subcontract's two-year base period has expired, but that Portage

continues to perform under the second and final option to extend the contract, which will not

8

expire until September 2016.  Dkt. 22-1 at 2–3 (Cloar Decl. ¶ 4).  Then, in December 2015, the

Court ordered the parties to file supplemental briefs addressing whether 28 U.S.C. § 1491(b)(1),

as modified by ADRA's sunset provision, vests exclusive jurisdiction over this action in the

Court of Federal Claims.  Dkt. 20; Dec. 18, 2015 Minute Order.  Validata responded that

jurisdiction, in its view, was properly asserted in this Court.  The government, in contrast,

initially took the position that this Court lacks jurisdiction.  *See* Dkt. 24 at 1 n.2.  It subsequently

reconsidered that position, however, and ultimately agreed with Validata that § 1491(b)(1) does

not apply to challenges to subcontract procurements.  *See id.*  For the reasons explained below,

the Court concludes that it is without jurisdiction.

## II.  ANALYSIS

### A.  Section 1491(b)(1)

At the time it was enacted, in 1996, ADRA granted the federal district courts and the

Court of Federal Claims overlapping jurisdiction over covered procurement litigation.  28 U.S.C.

§ 1491(b)(1).  That changed, however, in 2001, when ADRA's sunset provision eliminated the

jurisdiction of the federal district courts and vested the Court of Federal Claims with exclusive

jurisdiction over these cases.  *See* Pub. L. No. 104-320, § 12(d), 110 Stat. 3870, 3875 (1996)

(codified at 28 U.S.C. § 1491 note).  The relevant question, accordingly, is whether the present

suit falls within the scope of ADRA—in which case this Court must defer to the exclusive

jurisdiction of the Court of Federal Claims—or whether it falls beyond the scope of ADRA—in

which case this Court may resolve the dispute.

As originally pled, Validata's complaint seemed to answer this question, albeit in a self-

defeating manner.  Without recognizing that federal jurisdiction over ADRA suits expired in

2001, the complaint alleged that "[t]his Court has jurisdiction over this matter . . . under

[ADRA,] 28 U.S.C. § 1491(b)(1)." Dkt. 1 at 4 (Compl. ¶ 10(b)).  In its amended complaint, however, Validata corrected this misstep and deleted any reference to ADRA.  *See* Dkt. 6 at 6–7 (Amend. Compl. ¶ 11).[5]  Similarly, when first confronted with the jurisdictional issue, the government posited that ADRA deprived this Court of jurisdiction, but, on further reflection, agreed with Validata that ADRA does not apply.  *See* Dkt. 24 at 1 n.2.

There is, of course, no bar on a party changing its theory of jurisdiction in an amended pleading or on the parties' ability to revise their positions on a complicated issue prior to a ruling on that issue.  By the same token, however, neither Validata's revision of its theory of jurisdiction nor the parties' agreement that ADRA is inapplicable relieves the Court of its obligation to assess its own jurisdiction or permits the Court to skip to the merits of the dispute. "[T]he federal courts are courts of limited jurisdiction, and they lack the power to presume the existence of jurisdiction in order to dispose of any case on any other grounds."  *Loughlin v. United States*, 393 F.3d 155, 170 (D.C. Cir. 2004) (quoting *Tuck v. Pan Am. Health Org.*, 668 F.2d 547, 549 (D.C. Cir. 1981)).  As a result, the Court may not consider the merits of the government's pending motion to dismiss or, in the alternative, for summary judgment, Dkt. 12, without first determining whether it has jurisdiction.  *See Labat-Anderson, Inc. v. United States*, 346 F. Supp. 2d 145, 149 (D.D.C. 2004).

The question whether ADRA deprives this Court of jurisdiction over a challenge to an alleged agency action relating to a subcontract is a novel one.  Before addressing the specific issues posed, it is important to put ADRA in its historical context.

---

[5]  Notwithstanding the deletion of § 1491(b)(1) from its amended complaint, Validata asserted in its opposition to the government's motion to dismiss or, alternatively, for summary judgment that "DOE's unlawful actions . . . give this Court jurisdiction of this case under the 'violation of statute or regulation' prong of 28 U.S.C.[] § 1491(b)(1)."  Dkt. 14-1 at 28.

1.   *The History of ADRA*

Decades ago, federal procurement decisions and processes were largely immune from judicial review.  Most notably, in 1940 the Supreme Court rejected a challenge brought by seven iron and steel producers to the Secretary of Labor's determination of the minimum wage applicable to federal contractors on the ground that the producers lacked standing to challenge a federal procurement policy.  *See Perkins v. Lukens Steel Co.*, 310 U.S. 113, 132 (1940).  In the Court's view, federal procurement policy was purely a matter of governmental—or public— interest:  The procurement laws did not "bestow[] . . . [any] litigable rights upon those desirous of selling to the [g]overnment," but rather were enacted solely for the benefit of the government as purchaser.  *Id.* at 127.  Any duty created by the procurement laws, accordingly, was "owing to the [g]overnment and to no one else."  *Id.* at 126.  Because these laws protected only "public right[s] or interest[s]," private entities—including bidders on federal contracts—lacked any private right that they could assert in litigation, *id.* at 129, 132, and thus judicial enforcement of the procurement laws was unavailable.

The door was opened, but only slightly, when in 1956 the Court of Claims—a predecessor court to the Federal Circuit and the Court of Federal Claims—held that when the United States solicited bids for a government contract, it entered into an implied contract with the bidders requiring that the government consider the bids "honestly."  *Heyer Prods. Co. v. United States*, 140 F. Supp. 409, 412–414 (Ct. Cl. 1956).  When the United States breached that implied contract and induced the submission of bids with a foreordained plan to accept a different bid, the disappointed bidders were entitled to recover the "needless" cost of preparing their bids.  *Id.* at 413–14.  But that is as far as the court's holding went; disappointed bidders had no remedy for lost profits and no remedy for procedural flaws in the solicitation process.  *Id.* at

412.  It thus remained the case that the procurement laws were, with only minor exception, treated as a source of public, and not private, rights.  *Id.* (citing, among other cases, *Perkins*, 310 U.S. 130).

That state of affairs changed far more substantially in 1970, when the D.C. Circuit took a fresh look at the validity of the distinction between public and private rights in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970).  As that decision explained, the enactment of the APA in 1946 "greatly modified" the relevant law.  *Id.* at 865.  Most notably, the "legal rights doctrine," which underlay the Supreme Court's decision in *Perkins*, was replaced by the APA's "presumption of [the availability of] judicial review to one 'suffering legal wrong because of agency action.'"  *Id.* at 866 (quoting 5 U.S.C. § 702).  Applying that presumption and rejecting the *Perkins* rule, the D.C. Circuit held that "a frustrated bidder for a government contract ha[d] standing to sue, alleging illegality in the manner in which the contract was let."  *Id.* at 861; *see also id.* at 873.  As the court explained, where

> Congress has laid down guidelines to be followed in carrying out its mandate in a specific area, there should be some procedure whereby those who are injured by the arbitrary or capricious action of a governmental agency or official in ignoring those procedures can vindicate their very real interests, while at the same time furthering the public interest.

*Id.* at 864.  After the D.C. Circuit's decision, courts in other circuits followed suit, applying what became known as the "*Scanwell* doctrine."  *See* Romualdo P. Eclavea, *Standing of Unsuccessful Bidder for Federal Procurement Contract to Seek Judicial Review of Award*, 23 A.L.R. Fed. 301 § 3[b] (collecting cases from the Second, Third, Fourth, Seventh, Tenth, and Eleventh Circuits).  Under that doctrine, "government contract procurements were reviewable in federal district courts . . . [under] the judicial review provisions of the APA."  *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001).

Post-*Scanwell*, the jurisdiction of the Court of Claims and its successor courts continued to evolve.  In 1982, Congress enacted the Federal Courts Improvement Act ("FICA"), which abolished the Court of Claims and created the Court of Appeals for the Federal Circuit and the Claims Court (renamed the Court of Federal Claims in 1992).  *See* Pub. L. No. 97-164, 96 Stat. 25 (1982); Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 902, 106 Stat. 4506, 4516.  Among other things, FICA accorded the Claims Court "exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper" in cases "brought before the [disputed] contract is awarded."  FICA § 133(a), 96 Stat. at 40 (codified at 28 U.S.C. § 1491(a)(3) (1988)).  The following year, the Federal Circuit construed FICA to limit the jurisdiction of the Claims Court to cases filed "before the involved contracts have been awarded," and it thus transferred a post-award challenge brought by a disappointed bidder to the federal district court.  *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1374 (Fed. Cir. 1983) (en banc).  Further complicating the matter, some Courts of Appeals held that FICA implicitly divested the federal district courts of jurisdiction to hear pre-award protest cases, while others concluded that the district courts continued to have concurrent jurisdiction over pre-award cases.  *See Emery Worldwide Airlines*, 264 F.3d at 1082 n.11 (collecting cases); *Labat-Anderson*, 346 F. Supp. 2d at 149–50 (same); *see also* Matthew H. Solomson & Jeffrey L. Handwerker, *Subcontractor Challenges to Federal Agency Procurement Actions*, 06-3 Briefing Papers 1, 4 (Feb. 2006).  This state of affairs led to confusion, forum shopping, and "a general lack of uniformity in bid protest law."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

In 1996, Congress enacted ADRA to remedy these problems.  As codified at 28 U.S.C. § 1491(b)(1), ADRA provides:

> Both the Unite[d] States Court of Federal Claims and the district courts of the
> United States shall have jurisdiction to render judgment on an action by an
> interested party objecting to a solicitation by a Federal agency for bids or
> proposals for a proposed contract or to a proposed award or the award of a
> contract or any alleged violation of statute or regulation in connection with a
> procurement or a proposed procurement.  Both the United States Court of Federal
> Claims and the district courts of the United States shall have jurisdiction to
> entertain such an action without regard to whether suit is instituted before or after
> the contract is awarded.

28 U.S.C. § 1491(b)(1).  It its initial form, ADRA thus "allowed both federal district courts and

the Court of Federal Claims to hear 'the *full range* of cases previously subject to review in either

system.'"  *Emery Worldwide Airlines*, 264 F.3d at 1079 (quoting 142 Cong. Rec. S11,849 (daily

ed. Sept. 30, 1996) (statement of Sen. Levin)) (emphasis added).

   ADRA, however, also contained a sunset provision.  Under that provision, "[t]he

jurisdiction of the district courts of the United States over the actions described in section

1491(b)(1) of title 28[] . . . terminate[d] on January 1, 2001."  Pub. L. No. 104-320, § 12(d), 110

Stat. 3870, 3875 (1996) (codified at 28 U.S.C. § 1491 note).  The sunset provision reflected

concern "that having multiple judicial bodies review bid protests of Federal contracts ha[d]

resulted in forum shopping . . . [and] result[ed in] disparate bodies of law . . . [and] no national

uniformity in resolving these disputes."  142 Cong. Rec. 26,645 (1996) (statement of Sen.

Cohen).  Congress viewed "[c]onsolidation of jurisdiction in the Court of Federal Claims [a]s

necessary to develop a uniform national law on bid protest issues and end the wasteful practice

of [forum] shopping."  142 Cong. Rec. 13,817 (1996) (statement of Sen. Cohen).

   "It is clear that Congress's intent in enacting ADRA with the sunset provision was to vest

a single judicial tribunal with exclusive jurisdiction to review government contract protest

actions."  *Emery Worldwide Airlines*, 264 F.3d at 1079.  But instead of adopting exclusive

jurisdiction outright, the use of a sunset provision reflected a "compromise"—for four years the

federal district courts and the Court of Federal Claims would be "equal forums . . . allow[ing] a practical test of whether both forums [we]re needed" to serve claimants outside of the District of Columbia.  142 Cong. Rec. 27,350 (1996) (statement of Rep. Maloney).  That "test" period came to an end in January 2001 without Congress taking action to extend the period of concurrent jurisdiction.  As a result, jurisdiction over an action covered by ADRA now lies *exclusively* in the Court of Federal Claims.  *See, e.g.*, *Fisher-Cal Indus., Inc. v. United States*, 747 F.3d 899, 901 (D.C. Cir. 2014).

       2.   *The Applicability of ADRA to the Present Dispute*

The starting point for construing the meaning of ADRA is, as usual, the language of the statute itself.  *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011).  Thus, to determine whether the present action is covered by § 1491(b)(1), the Court must consider whether this is (a) "an action by an interested party," (b) who is "objecting" (1) "to a solicitation by a Federal agency," (2) "to a proposed award or the award of a contract," or (3) to "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).  Here, Validata is not objecting "to a [government] solicitation," "to a proposed award," or to an actual "award of a [government] contract," and thus neither the first nor the second prong of ADRA's "objecting to" test is implicated.  The third prong, however, "does not require an objection to the actual procurement, but only [an objection] to the 'violation of a statute or regulation in connection with a procurement or a proposed procurement,'" *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999), and it thus "covers even non-traditional disputes arising from the procurement process as long as the violation is 'in connection with a procurement or proposed procurement,'" *Pub. Warehousing Co. K.S.C. v. Defense Supply Ctr.*, 489 F. Supp. 2d 30, 40 (D.D.C. 2007).

In the typical case, where an interested party objects to the violation of a statute or regulation in the context of a *prime contract*, this third prong establishes the exclusive jurisdiction of the Court of Federal Claims.[6]  What makes this case novel is that Validata alleges violations of a procurement statute and procurement regulations in the context of a *subcontract* entered into with a private party, UCOR, that separately contracted with the government. Validata and the government argue that ADRA does not cover these claims for two reasons: First, Validata and the government both contend that a subcontractor is not an "interested party" within the meaning of ADRA.  Dkt. 24 at 7–8; Dkt. 26-1 at 7–10.  Second, the government argues that Validata's claims do not allege a violation of a statute or regulation "in connection with a procurement," as required by the third prong of ADRA's "objecting to" test.  Dkt. 24 at 1–7.  In the government's view, the term "procurement" refers only to contracts entered into with the United States or its agents, and, as the government understands the facts, "DOE was not involved in UCOR's selection of Portage as a subcontractor."  *Id.* at 4.  As explained below, the Court concludes that Validata's claims are covered by ADRA and that this Court, accordingly, lacks jurisdiction to hear this case.

---

[6]  *See*, *e.g.*, *Pub. Warehousing*, 489 F. Supp. 2d at 35, 41–42 (challenge to agency's refusal to provide past performance evaluations of a contractor to other government agencies); *Outdoor Venture Corp. v. Mills*, 2011 WL 4744684, at *1 (E.D. Ky. Oct. 7, 2011) (challenge to SBA's application of a size-determination after SBA-OHA dismissed a size protest as untimely); *White Hawk Grp., Inc. v. United States*, No. 08-0038, 2009 WL 8663463, at *1–2 (W.D. Ok. 2009) (challenge to SBA's refusal to review a joint venture agreement in connection with a size protest); *Advanced Sys. Tech., Inc. v. Barrito*, No. 05-2080, 2005 WL 3211394, at *2, 5 (D.D.C. Nov. 1, 2005) (challenge to SBA-OHA decision designating a new NAICS code); *Chapman Law Firm v. United States*, 63 Fed. Cl. 25, 29–33 (2004) (challenge to dismissal by SBA of size protest for failure to meet pleading standard).  *But see Advance Const. Servs., Inc. v. United States*, 51 Fed. Cl. 362, 365 (2002) (holding "in connection with a procurement" clause "does not extend to alleged violations of statutes and regulations governing GAO's review of a bid protest").

a. "Interested party"

Only an "interested party" has standing to sue under § 1491(b)(1).  *See, e.g.*, *Pub. Warehousing*, 489 F. Supp. 2d at 42.  According to both Validata and the government, Validata is not an "interested party" because it was not a bidder, or a prospective bidder, on a federal contract, and it lacked any direct or cognizable interest in the prime contract.  *See* Dkt. 24 at 7–8; Dkt. 26-1 at 7–10.  In Validata's view, this does not foreclose its ability to sue in this Court based on the APA and federal-question jurisdiction, because the termination of federal district-court jurisdiction contained in ADRA's sunset provision is not implicated.  Dkt. 25 at 9–10.

"ADRA does not define 'interested party,' and until" 2001, there was considerable disagreement on the meaning of this key term even within the Federal Circuit.  *Baltimore Gas & Elec. Co. v. United States*, 290 F.3d 734, 736–37 (4th Cir. 2002).  "In some cases," the Court of Federal Claims applied the test for standing applicable in APA cases, while in other cases the court borrowed the narrower "actual or prospective bidder or offeror" standard from the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3551(2).  *Id.* at 737–38 (collecting cases); *see also Impresa*, 238 F.3d at 1333–34 ("It is unclear whether section 1491(b)(1) adopts the liberal APA standing requirement set forth in section 702 of the APA or whether it adopts the more restrictive standard set forth in 31 U.S.C. § 3551(2) for GAO review of bid protests." (internal footnote omitted)).  This difference in approach carried significant consequences.  CICA, which governs the bid-protest jurisdiction of the General Accounting Office ("GAO"), defines the term "interested party" to mean "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  31 U.S.C. § 3551(2)(A).  The test for APA standing, in contrast, requires only that the plaintiff meet the traditional requirements of Article III standing and that the plaintiff also

demonstrate that "[t]he interest he asserts [is] 'arguably within the zone of interests to be

protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish

Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012); *see also* 5 U.S.C. § 702

(providing a right to judicial review for "[a] person suffering legal wrong because of agency

action, or adversely affected or aggrieved by agency action within the meaning of a relevant

statute").

The Federal Circuit considered the meaning of "interested party" in § 1491(b)(1) in

*American Federation of Government Employees, AFL-CIO v. United States* (*AFGE*), 258 F.3d

1294 (Fed. Cir. 2001), where it decided "whether federal employees or their union

representatives ha[d] standing to challenge an executive agency cost comparison decision in the

Court of Federal Claims." *Id.* at 1298.  The Federal Activities Inventory Reform Act and a

substantively similar Office of Management and Budget ("OMB") Circular—OMB Circular No.

A-76—required executive agencies to engage in a competitive process to determine whether

certain of their activities could be performed more efficiently by the private sector.  *Id.* at 1296.

Based on these requirements, the plaintiff federal employees and their union challenged the

Defense Logistic Agency's solicitation of private-sector bids to provide certain defense services,

as well as its subsequent decision to award a contract outsourcing those services to a private-

sector company.  *Id.* at 1296–97.  The Federal Circuit concluded that the plaintiffs were not

"interested parties" within the meaning of ADRA and, on that basis, affirmed the Court of

Federal Claims's dismissal of the complaint for lack of jurisdiction.  *Id.* at 1302.

The *AFGE* Court acknowledged the difficulty in defining the term "interested party."  As

it explained, the term is not defined in ADRA, and ADRA's legislative history merely evinces an

intent to transfer the jurisdiction over *Scanwell* claims to the Court of Federal Claims, without

providing any clear guidance as to Congress's understanding of the breadth of the *Scanwell* doctrine. *Id.* at 1301.  As the Federal Circuit explained, that legislative history does not reveal whether Congress intended to limit ADRA's coverage to claims "brought by disappointed bidders" challenging the solicitation or award of a federal contract—since such claims constituted "[t]he vast majority of cases brought pursuant to *Scanwell*"—or whether it "intended to give the Court of Federal Claims jurisdiction over any contract dispute that could be brought under the APA"—since "*Scanwell* itself was based on the APA."  *Id.*

Faced with this difficulty, *AFGE* adopted the narrower reading of ADRA for three reasons:  First, it was "guided by the principle that waivers of sovereign immunity, such as that set forth in [ADRA], are to be construed narrowly."  *Id.*  Second, the Federal Circuit noted that, although the legislative history was not dispositive, it at times characterized the legislation as "permitting '*a contractor* to challenge a Federal contract award.'"  *Id.* (quoting 142 Cong. Rec. S11,848 (statement of Sen. Cohen) (emphasis in *AFGE*)).  And, finally, "[t]he language chosen by Congress, while not unambiguous," mirrored CICA, which, like ADRA, referred to an "interested party," but unlike ADRA, included a definition of that term.  *Id.* at 1302.  Relying on this holding, both Validata and the government contend that *AFGE* forecloses any contention that Validata is an "interested party" for purposes of ADRA.  *See* Dkt. 24 at 7–8; Dkt 26-1 at 7–10.  The Court disagrees that *AFGE* controls this case for two reasons.

*First*, the Court is not convinced that *AFGE*'s adoption of the CICA definition applies in a case, such as this, that implicates only the third prong of ADRA's "objecting to" test.  As noted above, an "interested party" may rely on ADRA under three distinct circumstances: (1) when challenging "a solicitation by a Federal agency for bids or proposals;" (2) when challenging "a proposed award or the award of a contract;" and, as relevant here, (3) when challenging "any

alleged violation of [a] statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).  The definition of "interested party" in CICA, in contrast, applies only to "objection[s] by an interested party" to a solicitation "by a Federal agency," the cancellation of "such a solicitation," the award of "such a contract," and the termination or cancelation "of such a contract."  31 U.S.C. § 3551(1)–(2).  That is, the relevant language of CICA concerns only challenges by a disappointed bidder to the federal government's solicitation, award, or termination of a contract, and it does not include any language paralleling the third clause of ADRA, which is all that is at issue here.  That third prong is "very sweeping," *RAMCOR*, 185 F.3d at 1289, and covers "*any* alleged violation of statute or regulation *in connection with* a procurement or a proposed procurement*,*" 28 U.S.C. § 1491(b)(1) (emphasis added).  In short, the types of objections recognized in CICA parallel the first two prongs of ADRA.  But CICA contains no definition of "interested party" for purposes of challenges to "any" violation of statutes or regulations "in connection with a procurement."  *See* 31 U.S.C. § 3551.

This distinction between the scope of CICA and ADRA was not at issue in *AFGE*, since the plaintiffs in that case brought a "bid protest action challenging the [federal agency's] final decision to award the contract to" a private offeror. *AFGE v. United States*, 46 Fed. Cl. 586, 590 (2000); *see also* 258 F.3d at 1299 (objection "'to a solicitation by a Federal agency'").  In that context—a bid protest brought in federal court to challenge the award of a federal contract—the Federal Circuit understanably looked to the analogous circumstances addressed in CICA—bid protests brought before the GAO.  *AFGE*, 258 F.3d at 1302.  But, in the present context, the analogy breaks down.  The GAO lacks any parallel authority to adjudicate a challenge to "any alleged violation of statute or regulation in connection with a procurement or a proposed

procurement."  *Compare* 28 U.S.C. § 1491(b), *with* 31 U.S.C. §§ 3551, 3552.  Thus, the fact that

the CICA definition does not address the standing of an "interested party" to bring such a

challenge is both unremarkable and uninformative.  The fact that *AFGE* did not address this

issue, moreover, is not surprising, since that case dealt with a challenge to the federal

government's award of a contract.  What matters for present purposes, however, is that ADRA

calls for "a standardization of bid protest adjudication between judicial bodies, not a

standardization between the GAO and the [Court of Federal Claims]."  Bryan M. Byrd,

*Contractors Stand Strong: Those "Adversely Affected or Aggrieved by Agency Action" Should*

*Have Standing to Expose Government Procurement Regulation Violations to Mitigate Waste in*

*Contingency Contracting*, 22 Fed. Cir. B.J. 707, 723–24 (2013).

     *Second*, even if *AFGE* is construed as adopting a broad rule that limits ADRA

jurisdiction to those cases in which the plaintiff was an "actual or prospective bidder[] or

offeror[] [with a] direct economic interest" that "would be affected by the award of the contract

or by failure to award the contract," 258 F.3d at 1302, the Court is not persuaded that this is a

tenable view of Congress's intent in adopting ADRA.  In *AFGE*, the Federal Circuit

acknowledged that "the plain language of the statute does not resolve" whether "interested party"

encompasses all APA procurement claims or only claims by "disappointed bidders" within the

meaning of CICA.  *Id.* at 1299–1301.  As just discussed, however, the language of ADRA is not

in equipoise.  To the contrary, the third prong of ADRA's "objecting to" test, the "in connection

with" clause, goes beyond CICA and does not require that the plaintiff be a "disappointed

bidder"—it merely requires that the plaintiff be an "interested party objecting to . . . any alleged

violation of statute or regulation in connection with a procurement or a proposed procurement."

28 U.S.C. § 1491(b)(1).  If this language were read to apply only to disappointed bidders, it is

difficult to imagine what work the "in connection with" clause would perform beyond the first two prongs of ADRA's "objecting to" test, which already permit challenges by those "objecting to" federal contract solicitations or awards. *Id.* By contrast, if the third prong of ADRA's "objecting to" test is construed to encompass the full range of APA claims previously pursued under the *Scanwell* doctrine—including claims by a plaintiff who is not a disappointed bidder within the meaning of CICA but who possesses standing under the broader standing rule of § 702 of the APA—the "in connection with" clause has independent import. The interpretative canon in favor of giving all language in a statute meaning, accordingly, counsels against simply incorporating the CICA standard into ADRA across-the-board. *See United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2330 (2011) ("'[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.'" (quoting *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988)).

   Although *AFGE* correctly noted that ADRA incorporates the *standard of review* found in § 706 of the APA and does not expressly incorporate the "aggrieved party" *standing rule* found in § 702 of the APA, *AFGE*, 258 F.3d at 1302 (discussing 28 U.S.C. § 1491(b)(4)), it failed to place similar weight on the fact that ADRA also does not expressly incorporate the "disappointed bidder" *standing rule* from CICA. The fact that CICA and ADRA both use the phrase "interested party," moreover, carries little weight. Putting aside for a moment amendments to CICA and ADRA adopted in response to *AFGE*, which are discussed below, CICA itself makes clear that its definition of "interested party" applies only "with respect to a contract or a solicitation or other request for offers," 31 U.S.C. § 3551(2)(A), "by a Federal agency," *id.* § 3551(1)(A). And the phrase "interested party" often appears in other contexts in the U.S. Code, *see, e.g.*, 19 U.S.C. § 3571; 28 U.S.C. § 2631(c); 26 U.S.C. § 7476(b), and in various

federal rules and regulations, *see, e.g.*, 5 C.F.R. §§ 2634.404, 2634.405; 26 C.F.R. § 1.7476-2; 43 C.F.R. § 3902.29.  In those statutes and regulations, it does not have the particular meaning specified in CICA.  Taken together, the language of CICA and these other statutes and regulations illustrate that the meaning of "interested party" depends on the relevant statutory context.  That context cannot be divorced from the broad language contained in the third prong of ADRA's "objecting to" test.  Thus, absent evidence that Congress intended ADRA to borrow the CICA definition across-the-board, the mere use of the phrase "interested party" in both statutes provides little guidance regarding congressional intent as to the meaning of "interested party" with respect to a challenge brought under ADRA's third prong.

The only legislative history suggesting that Congress viewed CICA and ADRA as related to one another comes from amendments enacted after the Federal Circuit decided *AFGE*—years after ADRA was adopted.  In 2004, Congress amended CICA to expand the definition of "interested party" to include an agency official submitting a "tender" in a public-private competition pursuant to OMB Circular A-76.  *See* Ronald W. Reagan Nat'l Def. Authorization Act for FY 2005, Pub. L. No. 108-375, Div. A, Title III, § 326(a), 118 Stat. 1811, 1848 (2004) (codified as amended at 31 U.S.C. § 3551).  Congress expanded the CICA definition yet again in 2007, adopting in substance the current language, which allows the specified agency official as well as persons designated to represent the interests of federal employees to participate in a public-private competition conducted under OMB Circular A-76.  *See* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, Div. D, Title VII, § 739(c)(1)(A), 121 Stat. 1844, 2030 (2007); *see also*  Pub. L. No. 110-181, Div. A, Title III, § 326(a), Jan. 28, 2008, 122 Stat. 3, 62 (codified at 31 U.S.C. § 3551(2)(B)).  At the same time that Congress enacted the 2007 amendment to CICA, it also amended ADRA to permit the specified agency official or

public-employee representative "described in" the new CICA provision "to intervene" in an action commenced by "a private sector interested party . . . in the case of a public-private competition" under OMB Circular A-76.  Pub. L. No. 110-161, § 739(c)(2), 121 Stat. at 2031. And, finally, in 2008, Congress amended ADRA to adopt the current version of the statute, providing that "[i]f an interested party who is a member of the private sector commences an action" under ADRA "with respect to a public-private competition conducted under . . . [OMB Circular A-76], then an interested party described in section 3551(2)(b) of [CICA] shall be entitled to intervene in the action."  Pub L. No. 110-181, Div. A, Title III, sec. 326(c), 122 Stat. at 63 (codified at 28 U.S.C. § 1491(b)(5)).[7]

Although these amendments show that, in 2007 and 2008, Congress intended to provide an opportunity for certain agency procurement officials and certain federal-employee representatives to participate in both GAO and judicial bid-protest proceedings respecting public-private competitions under OMB Circular A-76—thereby overruling the holding of *AFGE*—they fail to establish that Congress intended that "interested party" have the same meaning in ADRA as in CICA.  Indeed, if Congress simply intended to incorporate the CICA definition of "interested party" into ADRA across-the-board, there would have been no need to amend ADRA at all in 2007 and 2008; rather, amending the CICA definition would have been sufficient to expand the scope of ADRA.  Even more significantly, the amendment that Congress did make to ADRA does not parallel CICA.  Under CICA, an "interested party," including the specified agency official, may initiate a GAO bid protest if a majority of the employees engaged

---

[7]   Congress amended ADRA for a second time in 2008 to delete the 2007 language from 28 U.S.C. § 1491(b)(5); it had inadvertently created two, parallel (b)(5) subsections in the codification. *See* Pub. L. No. 110-417, Div. A, Title X, § 1061(d), 122 Stat. 4356, 4613 (2008); 28 U.S.C. § 1491(b)(5) (Jan. 28, 2008 to Oct. 13, 2008).

in the activity subject to the private-public competition so request.  31 U.S.C. § 3552(b).  In contrast, ADRA merely permits the specified agency official or a federal-employee representative *to intervene* in an action brought by "an interested party who is a member of the private sector."  28 U.S.C. § 1491(b)(5).

And, most importantly, any arguable parallel between CICA and ADRA breaks down, as explained above, where the plaintiff's cause of action falls under the third prong of ADRA's "objecting to" test, which does not require that the plaintiff object to a federal contract solicitation or award.  *Id.* § 1491(b)(1); *RAMCOR*, 185 F.3d at 1289.  The specific provisions of ADRA dealing with public-private competitions adopted in the wake of *AFGE* may *expand* ADRA to permit certain parties to intervene, but there is no reason to conclude that it *limited* ADRA jurisdiction in a manner that would, in effect, read the third prong out of ADRA's "objecting to" test.  That is, this subsequent legislative history shows that Congress intended to overrule *AFGE*'s narrow holding that public employees and their representatives were not interested parties with respect to private-public competitions under OMB Circular A-76, but there is no reason to believe that Congress considered, much less adopted, the broad reading of *AFGE* urged by the parties here.  A more plausible reading of the legislative history is that Congress sought to expand ADRA to permit intervention by certain parties who otherwise would not even qualify as an "aggrieved person" under § 702 of the APA.

Nor is the Court convinced that the Federal Circuit was correct to adopt the narrower CICA standard based on the premise that waivers of sovereign immunity should be construed narrowly.  *See AFGE*, 258 F.3d at 1301.  The relevant question is not *whether* Validata can bring suit, but *where* it must do so.  ADRA is both jurisdiction-conferring and, by implication, jurisdiction-denying.  Thus, by reading the provision narrowly, the Federal Circuit limited the

jurisdiction of the Court of Federal Claims but arguably expanded the jurisdiction of the federal district courts across the country.  This is because, as discussed above, *Scanwell* recognized that the APA confers standing on any aggrieved person to challenge an unlawful or arbitrary agency action, including in procurement cases.  *See* 424 F.2d at 872–73.  Under one view of ADRA, adopted here, Congress transferred jurisdiction over all APA procurement cases to the Court of Federal Claims, while under the other view, arguably adopted in *AFGE*, Congress transferred jurisdiction only over claims brought by disappointed bidders on federal contracts, 258 F.3d at 1302.  Yet, either way, ADRA cannot reasonably be construed to have wholly abolished APA procurement claims that might otherwise have been brought under *Scanwell*.  The difference between the two constructions is simply whether jurisdiction over some claims remains in the district courts or whether all such claims must now be brought in the Court of Federal Claims. The principle that waivers of sovereign immunity are to be construed narrowly adds nothing to the deliberation over which of these constructions is correct.

The narrow jurisdictional rule supported by the parties and applied in *AFGE* also runs counter to ADRA's purpose of "[c]onsolidati[ng] . . . jurisdiction in the Court of Federal Claims . . . to develop a uniform national law on bid protest issues and end the wasteful practice of [forum] shopping."  142 Cong. Rec. S6156 (daily ed. June 12, 1996) (statement of Sen. Cohen). *AFGE* is correct that ADRA's legislative history focuses on "repeal of the Federal district courts' *Scanwell* jurisdiction" and the concentration of jurisdiction over "bid protest" actions in a single court.  142 Cong. Rec. S11848 (Sept. 30, 1996) (statement of Sen. Cohen); *see also id.* at S6156 (daily ed. June 12, 1996) (statement of Sen. Cohen).  But, although *Scanwell* was itself a disappointed-bidder case and "[t]he vast majority of cases brought pursuant to *Scanwell* were brought by disappointed bidders," *AFGE*, 258 F.3d at 1301, its reasoning extended to all disputes

involving government procurements where a party with APA standing alleged a violation of a federal statute or regulation.  It is also a mistake to equate the "vast majority of cases brought pursuant to *Scanwell*," with all *Scanwell* cases.  In fact, district courts did entertain challenges by subcontractors to subcontract procurements under the *Scanwell* doctrine prior to enactment of ADRA.  *See, e.g.*, *Bayou State Sec. Servs. v. Dravo Util., Inc.*, 674 F.2d 325, 326–28 (5th Cir. 1982); *Am. Dist. Tele. v. Dep't of Energy*, 555 F. Supp. 1244, 1245–48, (D.D.C. 1983); *Lombard Corp. v. Resor*, 321 F. Supp. 687, 688–91 (D.D.C. 1970).  There is no evidence that Congress intended to leave jurisdiction over these *Scanwell* claims in the federal district courts, while vesting the Court of Federal Claims with exclusive jurisdiction over a narrower subset of *Scanwell* claims.

Most significantly, the legislative history of ADRA reflects Congress's intent to consolidate all procurement-related claims against the government in a single tribunal.  As explained in the Conference Report, "[i]t [was] the intention of [ADRA's] Managers to give the Court of Federal Claims exclusive jurisdiction over *the full range of procurement protest cases* previously subject to review in the federal district courts and the Court of Federal Claims."  H.R. Conf. Rep. 104-841, at 10 (1996) (emphasis added).  Senator Cohen echoed this theme, stressing that "[t]he Court of Federal Claims should be the single judicial forum with jurisdiction to consider all protests that can presently be considered by any district court or by the Court of Federal Claims."  142 Cong. Rec. S11849 (daily ed. Sept. 30, 1996) (statement of Sen. Cohen). In particular, Congress hoped that by concentrating all of these cases in a single court it could (1) promote uniformity in procurement law, *see id.* at S6156 (daily ed. June 12, 1996) (statement of Sen. Cohen) (explaining that legislation will "creat[e] a single forum for all bid protest litigation, which will lead to the development of more uniform, and thus more predictable, law"); (2)

prevent forum shopping, *see id.* at S11848 (daily ed. Sept. 30 1996) (statement of Sen. Cohen) ("[H]aving multiple judicial bodies review bid protests of Federal contracts has resulted in forum shopping[,] . . . disparate bodies of law[,] . . . [and] no national uniformity . . . ."); and (3) provide litigants with the benefit of the "substantial experience and expertise [of] the Court of Federal Claims," 142 Cong. Rec. S6156 (daily ed. June 12, 1996) (statement of Sen. Cohen). These objectives, moreover, were framed—as described above—against a history of decades of confusion regarding the proper forum for review of procurement disputes.  Neither the parties nor the *AFGE* decision has articulated any reason why, with this background in mind, Congress would have intended to vest the federal district courts with exclusive jurisdiction to hear, for example, NAICS code or size appeals brought by subcontractors, while vesting the Court of Federal Claims with exclusive jurisdiction to consider precisely the same issues when raised by a prime contractor.

In addition to *AFGE*, the parties rely on two other lines of cases, neither of which supports their contention that Congress intended to give this Court exclusive jurisdiction over procurement cases brought by subcontractors, while giving the Court of Federal Claims exclusive jurisdiction over similar claims brought by prime contractors.  The first line of cases involves subcontractor challenges to the award of prime contracts.  Prior to *AFGE*, in *MCI Telecommunications Corp. v. United States*, the Federal Circuit interpreted the Brooks Act, which expressly included a definition of "interested party" nearly identical to the CICA definition.  *See MCI Telecomms. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989); *see also* 40 U.S.C. § 759(f)(9) (1988); 31 U.S.C § 3551(2)(A); *cf. Eagle Design & Management, Inc. v. United States*, 62 Fed. Cl. 106, 109 n.10 (2004) (explaining differences not relevant here). The court held that the plaintiff, a subcontractor under one company's bid for a prime contract

with the government, lacked standing to challenge the government's award of the prime contract to another company because the subcontractor was not "an actual or prospective bidder" on the prime contract. *MCI Telecomms. Corp.*, 878 F.2d at 365. Since then, Court of Federal Claims decisions have applied *MCI Telecommunications Corp.* to ADRA to hold that "a subcontractor to a disappointed bidder[]" lacks "interested party" standing to challenge the government's award of a prime contract. *Eagle Design & Management*, 62 Fed. Cl. at 106, 109; *see also Klinge Corp. v. United States*, 87 Fed. Cl. 473, 477 (2009) (applying *Eagle Design*).

That principle, however, has nothing to do with the circumstances present here. Validata is not challenging the award of the prime contract to UCOR. It is challenging agency action taken in conjunction with the award of the subcontract to Portage. To be sure, the proper plaintiff to challenge the government's actions with respect to a *prime* contract is generally the prime contractor because "the standing doctrine embraces the general prohibition against a litigant's raising another entity's legal rights." *Eagle Design*, 62 Fed. Cl. at 109. But that says nothing about the proper plaintiff to challenge the government's actions, if any, with respect to a *subcontract. Cf. Int'l Genomics Consortium v. United States*, 104 Fed. Cl. 669, 674, 679 (2012) (holding that the Court of Federal Claims lacked jurisdiction to consider a subcontractor's challenge to the government's decision regarding the scope of a prime contract, but that it had jurisdiction to consider claims that federal procurement rules were violated in conducting the subcontract procurement). Here, Validata bid on the subcontract, and thus, to the extent that the government violated the governing statutes and regulations relating to that contract, there is no other party with a more direct interest.

The second, more relevant, line of cases relied on by the parties involve subcontractor challenges to a *subcontract* award. In *U.S. West Communications Services, Inc. v. United States*,

the Federal Circuit held, prior to *AFGE*, that the Brooks Act and CICA do not encompass challenges to subcontract procurements absent the assumption of an agency relationship between the prime contractor and the government.  940 F.2d 622, 627–30 (Fed. Cir. 1991).  Other judges of this Court and the Fifth Circuit have also held that CICA generally does not cover challenges to subcontract procurements, but they have adopted a separate set of exceptions that differ from the Federal Circuit's agency-based test.  *Contractors Engineers Int'l, Inc. v. U.S. Dep't of Veterans Affairs*, 947 F.2d 1298, 1300–02 (5th Cir. 1991); *Info. Sys. & Networks Corp. v. U.S. Dep't of Health & Human Servs.*, 970 F. Supp. 1, 8–9 (D.D.C. 1997); *Amdahl Corp. v. Baldridge*, 617 F. Supp. 501, 504–08 (D.D.C. 1985).  This line of cases, however, stems from the plain language of the Brooks Act and CICA and from legislative history specific to those statutes.  *See, e.g.*, *U.S. West Communications Services*, 940 F.2d at 627–30; *Info. Sys. & Networks Corp.*, 970 F. Supp. at 7–9.  These cases are, therefore, of little value in interpreting the distinct language and purposes of the ADRA.

Finally, Validata points to cases holding "that a subcontractor would have standing in district court, assuming the subcontractor met the APA 'zone of interests' standing test" to assert that this Court should reach the merits of its claims.  Dkt. 26-1 at 11 (citing *RAMCOR*, 185 F.3d at 1290; *Contractors Engineers*, 947 F.2d at 1300–01 & n.9; *Info. Sys. & Networks Corp.*, 970 F. Supp. at 9 n.9; *Amdahl Corp.*, 617 F. Supp. at 504–08).  But all of the cited decisions predate the sunset of the district courts' jurisdiction under ADRA.  As a result, they provide no guidance regarding the current jurisdiction of the district courts.

For all of these reasons, the Court holds that Validata is an "interested party" within the meaning of ADRA.

b.  "In connection with a procurement"

The government, but not Validata, also raises a second argument for why, in its view, this

case does not implicate the exclusive jurisdiction of the Court of Federal Claims under ADRA.

As it notes, the third and only arguably applicable prong of ADRA's "objecting to" test applies

to "alleged violation[s] of [a] statute or regulation in connection with a procurement or a

proposed procurement."  28 U.S.C. § 1491(b)(1).  In the government's view, this provision

applies only to challenges brought to "procurements," and Validata is not challenging a

government procurement, but rather a private subcontract.  *See* Dkt. 24 at 8.  The Court agrees

that the term "procurement," as used in ADRA, refers to prime contracts entered into with a

government agency and not to a private party's acquisition of goods or services.  But it disagrees

that the third prong of the "objecting to" test has the narrow meaning that the government

ascribes to it.

The government argues that the definition of "procurement" contained in 41 U.S.C. § 111

and adopted by the Federal Circuit with respect to ADRA shows that Validata's attack on the

UCOR subcontract is not "in connection with" a "procurement."  Dkt. 24 at 6–7; *see also*

*Distrib. Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008).  That contention,

however, fails for at least two reasons.  First, that definition of "procurement" is capacious.  It

includes "all stages of the process of acquiring property or services, beginning with the process

for determining a need for property or services and ending with contract completion and

closeout."  41 U.S.C. § 111.  Second, the SBA Act, which lies at the core of this dispute,

provides that "all contracts let by any Federal agency," with exceptions not relevant here, must

include a requirement that the prime contractor "carry out" the "policy" of ensuring that small

businesses "have the maximum practicable opportunity to participate in the performance of

contracts let by any Federal agency, including . . . subcontracts for . . . related services for major systems." 15 U.S.C. § 637(d).  Accordingly, the subcontract solicited by UCOR included a small business subcontracting preference as a condition of the prime contract—that is, as a condition of the federal procurement.

ADRA "does not require an objection to the actual contract procurement, but only [an objection] to" a statutory or regulatory violation committed "'*in connection with* a procurement or a proposed procurement.'" *RAMCOR*, 185 F.3d at 1289 (emphasis added).  This language is "sweeping," *id.*, and "covers even non-traditional disputes arising from the procurement process as long as the violation is 'in connection with a procurement or a proposed procurement,'" *Pub. Warehousing*, 489 F. Supp. 2d. at 40 (emphasis added).  Here, even though the "procurement" within the meaning of ADRA was between UCOR and DOE, the subcontract for which Validata was a disappointed bidder, and the various regulatory requirements that Validata attempts to assert, were "in connection with" that procurement.  Indeed, it is safe to assume that, had the dispute arisen in the context of a purely private, commercial transaction, Validata would have had no arguable basis to invoke a small business set-aside requirement or to challenge the failure of DOE and the SBA to follow the relevant rules and regulations.  But because the small business preference at the core of Validata's complaint existed as a *condition of the prime contract*, "any alleged violation of statute or regulation" with respect to *that condition* necessarily arose "in connection with" the prime contract.

The government resists this characterization of the dispute, insisting that "Validata's claims amount to nothing more than a business dispute between private parties."  Dkt. 24 at 1–2.  But Validata has not sued UCOR.  *See* Dkt. 6 at 8 (Amend. Compl. ¶ 13).  Instead, it challenges SBA-OHA's adjudication of its NAICs code appeal, DOE's purported usurping of SBA's

exclusive authority to adjudicate a size protest, and DOE's purported consent to the subcontract notwithstanding the alleged violations of the procurement laws.  Dkt. 6 at 12–14 (Amend. Compl. ¶¶ 32–39).  The Court expresses no view on whether there is merit to any or all of these claims.  But it has no hesitation concluding that they are challenges to agency action and not challenges to actions taken by the private, prime contractor.  The government may believe that it was UCOR, and not the government or its agents, that took the relevant actions.  That, however, is a merits defense.[8]  Validata is the master of its own complaint, and it has alleged claims against the government.  Those claims are the allegations that are before the Court, and the government cannot simply recast this case as one in which UCOR is the defendant.

The Court's role at this juncture is not to assess what actions DOE or SBA took—or failed to take.  If the agencies did take actions that violated federal procurement laws or regulations as alleged, those claims would fall within the "in connection to a procurement" prong of ADRA.  Any involvement that DOE and SBA may have had in approving the UCOR subcontract or in resolving Validata's size protest and NAICs code appeal would have occurred solely by dint of the prime contract and solely within the course of the prime contract's completion.  *Cf. Alatech Healthcare LLC v. United States*, 89 Fed. Cl. 750, 754 (2009) (holding court had jurisdiction over subcontractor challenge to subcontract procurement where government decided "whether to use a prime contractor for procurement, to provide the prime's specifications and parameters for the job, and to define the governing authority for that

---

[8]  In support of its argument that it had no involvement in the process of awarding the UCOR subcontract, the government offers some evidence that DOE did not take any action to approve or to consent to the UCOR subcontract.  Dkt. 22-1 at 2 (Cloar Decl. ¶¶ 2–3).  It does not offer any evidence with regard to what involvement, if any, DOE officials played in Validata's unsuccessful attempt to file a size protest.  And there can be no dispute that SBA-OHA issued a decision on Validata's NAICs code appeal.

contractor").  To the extent that DOE and SBA made any reviewable "agency decision" at all,

that decision was "in connection with a procurement," and exclusive jurisdiction to adjudicate

the case lies in the Court of Federal Claims.  Validata may or may not ultimately prevail in

showing that DOE and the SBA violated the law "in connection with" a procurement, but that is

Validata's claim, and if it "states a claim within the jurisdiction of any court, it is within the

exclusive Tucker Act jurisdiction of the United States Court of Federal Claims pursuant to"

ADRA.  *Fisher-Cal, Indus.*, 747 F.3d at 903.

The Court, accordingly, concludes that Validata's claims "allege violations[s] of [a]

statute and regulation[s] in connection with a procurement or a proposed procurement" within

the meaning of ADRA.

3.  *Constitutional Claim*

Validata's attempt to reframe its claim against SBA-OHA as a constitutional due process

challenge does not alter the Court's conclusion that the Court of Federal Claims has exclusive

jurisdiction over this action.  "The determination of whether a claim belongs in the district court

or in the Court of Federal Claims depends upon whether the claim is at its essence one covered

by the relevant Court of Federal Claims statute—here, ADRA—or is instead a constitutional or

other statutory claim."  *Pub. Warehousing*, 489 F. Supp. 2d at 43 (internal quotation marks

omitted).  In making that determination, the Court considers two factors: (1) "the source of the

rights upon which the plaintiff bases it claims" and (2) "the type of relief sought."  *Id.* at 43.

Here, both factors support the conclusion that exclusive jurisdiction lies in the Court of

Federal Claims.  Validata's due process claim alleges only that SBA-OHA "improperly denied

Plaintiff due process by prohibiting Plaintiff from timely exercising its rights as a contract

competitor under the federal procurement regulatory system" and simply asserts rights "under

the federal procurement regulatory system" to a NAICS code appeal.  Dkt. 6 at 13 (Amend.

Compl. ¶ 36).  There is no indication that this claim differs in any respect from Validata's claim

attacking as arbitrary and capricious SBA-OHA's decision dismissing its NAICS code appeal.

*Cf. Adv. Sys. Tech.*, 2005 WL 3211394 at *1–2 (due process claim challenging SBA-OHA's

decision to designate a new NAICs code was not properly before the district court in light of

ADRA).  To the contrary, although Validata invokes due process, its claim is ultimately

premised on its alleged statutory and regulatory right to bring a NAICS code appeal.  Similarly,

the relief that Validata seeks does not differ under its due process claims.  It does not seek any

additional process beyond what it contends it is already entitled to under the relevant statutes and

regulations.  It does not, for example, attack the governing regulations on the ground that they

violate due process.  Rather, it merely asserts that, under existing law, its NAICS code appeal

should have been decided on the merits rather than on grounds of mootness and timeliness.  Dkt.

6 at 13–14 (Amend. Compl. ¶¶ 35–36); *see also* Dkt. 14-1 at 26–27.  That claim is

indistinguishable from Validata's non-constitutional claim.

## B.  Sovereign Immunity

As explained above, the Court lacks jurisdiction over Validata's claims for injunctive and

declaratory relief.  The Court also concludes that it lacks jurisdiction over Validata's claims for

money damages.

Absent a clear waiver of sovereign immunity, the Court is without jurisdiction to

adjudicate a claim against the United States.  *See Lane v. Peña*, 518 U.S. 187, 192 (1996); *FDIC

v. Meyer*, 510 U.S. 471, 475 (1994).  Validata's amended complaint and its supplemental brief

on jurisdiction fail to cite any statutory provision waiving the sovereign immunity of the United

States with respect to Validata's claim to damages; in those documents, it relies only on this

Court's diversity and federal-question jurisdiction and does not identify any waiver of sovereign immunity beyond that contained in the APA.  *See* Dkt. 26-1 at 5–7; Dkt. 6 at 6–7 (Amend. Compl. ¶ 11).  The APA, however, does not waive sovereign immunity with respect to claims for damages, but only claims for for non-monetary relief.  *See Clark v. Library of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984).  Nor does Validata seek to assert "a *Bivens*-type action where suit is brought against a federal official in his individual capacity for violations of a plaintiff's constitutional rights" and where "there is no sovereign immunity bar."  *Id.* at 102–103.

Although Validata's amended complaint and supplemental brief on jurisdiction make no mention of the Little Tucker Act, 28 U.S.C. § 1346(a)(2), *see* Dkt. 6 at 6–7 (Amend. Compl. ¶ 11); Dkt. 26-1 at 5–7, Validata appears to contend in its opposition to the government's motion to dismiss or, alternatively, for summary judgment that this Court has jurisdiction over its damages claims under that Act, *see* Dkt. 14-1 at 28 (conceding in its opposition brief that this Court lacks subject-matter jurisdiction over its monetary claims "over $10,000").  *See also* Wright & Miller, *Statutory Exceptions to Sovereign Immunity—Actions Under the Tucker Act*, 14 Fed. Prac. & Proc. Juris. § 3657 (4th ed.) ("[T]he plaintiff may waive all damages over $10,000 in order to bring the claim within the district court's subject matter jurisdiction [under the Little Tucker Act.]").

 As relevant here, the Little Tucker Act provides concurrent jurisdiction in the federal district courts over:

> Any . . . claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1346(a)(2).  It "constitutes a waiver of sovereign immunity with respect to [such] claims."  *United States v. Mitchell*, 463 U.S. 206, 212 & n.10 (1983).[9]  This Court, however, lacks Little Tucker Act jurisdiction over Validata's damages claims for two reasons.

*First*, even if the amended complaint relied on the Little Tucker Act, the more specific, exclusive jurisdictional provisions of ADRA oust this Court's Little Tucker Act jurisdiction where ADRA applies.  *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1246 (Fed. Cir. 2010) ("Congress intended the 1491(b)(1) jurisdiction to be exclusive where 1491(b)(1) provided a remedy (in procurement cases).").

*Second*, the Little Tucker Act does not "create any substantive right enforceable against the United States for money damages."  *Mitchell*, 463 U.S. at 216 (internal quotation marks and citations omitted).  "A substantive right [against the United States for money damages] must be found in some other source of law, such as 'the Constitution, or any Act of Congress, or any regulation of an executive department.'"  *Id.* (quoting 28 U.S.C. § 1491).  "[T]he claimant must demonstrate," moreover, "that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained."  *Id.* at 216–17 (internal quotation marks omitted).  Here, Validata has made no such showing, nor is the Court aware of any substantive law permitting a subcontractor to recover damages from the United States on grounds like those alleged by Validata.  *See* Wright & Miller, *Statutory*

---

[9]  Although *United States v. Mitchell* pertained to the scope of jurisdiction granted to the Court of Federal Claims in 28 U.S.C. § 1491(a)(1)—the "Big Tucker Act"—the *Mitchell* Court's analysis applies equally to the grant of jurisdiction to the district courts in 28 U.S.C. § 1346(a)(2)—the "Little Tucker Act."  The scope of the two statutes is the same, except that the former jurisdictional grant is not limited to claims under $10,000.  *See United States v. Bormes*, 133 S. Ct. 12, 16 n.2 (2012); *see also* Wright & Miller, *Statutory Exceptions to Sovereign Immunity— Actions Under the Tucker Act*, 14 Fed. Prac. & Proc. Juris. § 3657 (4th ed.) ("In actions under the Tucker Act, each district court sits in effect as another Court of Federal Claims.").

*Exceptions to Sovereign Immunity—Actions Under the Tucker Act*, 14 Fed. Prac. & Proc. Juris. § 3657 n.201 (4th ed.) ("[T]he Administrative Procedure Act cannot provide jurisdiction in a Tucker Act claim . . . ."); *Hampel v. United States*, 429 F. Appx. 995, 998 (Fed. Cir. 2011) ("It is well-settled that [the Due Process Clauses of the Fifth and Fourteenth Amendments] do not mandate payment of money."); 15 U.S.C. § 637(b)(6) (SBA empowered to make small business determination); FAR §§ 19.301-1(b), 19.302(c) (size protests to be forwarded to area SBA office).  This Court, accordingly, also lacks jurisdiction over Validata's claims for money damages.[10]

## III.  CONCLUSION

The Court recognizes that should the Court of Federal Claims disagree with its conclusion that ADRA and its sunset provision vest that court with exclusive jurisdiction over this action, the result could be an unfortunate "perpetual game of jurisdictional ping-pong" in which "the litigants are bandied back and forth helplessly between two courts, each of which insists the other has jurisdiction."  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818 (1988).  As the Supreme Court has explained, "principles of law of the case" may ameliorate this problem.  *Id.* at 819.  But, whether or not that principle applies, it would be improper for this Court to avert the potential problem by reaching the merits notwithstanding its lack of jurisdiction.  *See id.*

For the forgoing reasons, the Court concludes that it lacks jurisdiction over Validata's claims and, in the interest of justice, transfers the case to the Court of Federal Claims, where the

---

[10]   *But see* 28 U.S.C. § 1491(b)(2), giving Court of Federal Claims jurisdiction to award "monetary relief . . . limited to bid preparation and proposal costs."

action could have been brought at the time it was filed.  *See* 28 U.S.C. § 1631; *Labat-Anderson*,

346 F. Supp. 2d at 155.

<u>s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date: March 11, 2016